OHIO VALLEY GAS, INC., Appellant
(Defendant Below),

v.

Prentice D. BLACKBURN, Administrator
of the Estate of Katherine R. Black-
burn, Deceased, Appellee (Plaintiff Be-
low),

and

City of Sullivan, Indiana, Appellee
(Defendant Below).

No. 4–182A19.

Court of Appeals of Indiana,
Fourth District.

March 7, 1983.

William A. Wick, John J. Sullivan, White, Raub, Reis, Wick & Riegner, Indianapolis, Rabb Emison, Emison, Emison, Doolittle & Kolb, Vincennes, for appellant.

Joe D. Black, Ramsey & Black, Vincennes, Hansford C. Mann, Mann, Chaney, Johnson & Goodwin, Terre Haute, for Prentice D. Blackburn, Adm.

# 1380

Harry A. Wilson, Jr., Wilson & Kehoe, Indianapolis, Paul B. Ledford, Ledford, Kirchoff, Doll & Webster, Vincennes, R.D. Zink, Meils, Zink, Thompson, Page & Dietz, Indianapolis, for City of Sullivan.

CONOVER, Judge.

Ohio Valley Gas, Inc. (OVG) appeals a $700,000 jury verdict. Decedent Katherine R. Blackburn was killed when one of OVG's gas lines in the city of Sullivan (City) exploded. This suit resulted.

We affirm.

ISSUES

This appeal presents the following issues:

1. Whether the trial court erred in refusing to admit an edited version of a loan receipt agreement when the editing was done by the offering party.

2. Whether the trial court erred in refusing to admit prior inconsistent statements of City's employees Robins, Unger and Lewis.

3. Whether the trial court erred in admitting photographs of unbarricaded gas service lines of OVG other than the service line at issue.

4. Whether the trial court erred in admitting into evidence certain federal and state pipeline safety regulations.

5. Whether the trial court erred in refusing to give OVG's instruction on the inapplicability of such pipeline safety regulations.

6. Whether the trial court erred in dismissing OVG's cross-claim against City.

FACTS

The facts most supportive of the verdict in this case are as follows:

In 1965, OVG installed an above-ground gas line in the alley behind the Girls' Country Building located in the City to bring natural gas service to that building. The gas line entered the building through a coal chute window. No special barricade was erected in front of this line, although some protection was afforded by a cast iron drain pipe, possibly a stone step, and a window air conditioner above it, probably none of which had been installed by OVG to protect its exposed line.

Because of the "Blizzard of '78", a large amount of ice and snow accumulated in the alley behind the Girls' Country Building. One February afternoon while a city snow removal crew was operating a tractor with a front end loader clearing the alley of ice and snow near the exposed gas line, deceased's daughter heard loud noises from the basement like "a dropping of pots and pans or somethin', hittin', metal against metal, hitting each other and falling on the floor." Later an odor of gas permeated the building, and decedent reported the gas leak to OVG. It immediately sent two gas service men to the scene. They checked the basement where the gas meter was located. One of them came up and advised decedent and her daughter he was going to see if he could shut off the gas. He told them to leave the building and stay outside.

Decedent told her daughter she was going to warn Mrs. Bean, another small store owner located at the rear of the building. When the gas man entered the alley, he waived to the tractor operator. As he did so, an explosion occurred which killed four people, including decedent. A brick wall fell on her. Decedent's surviving husband as administrator on behalf of himself and his three daughters (survivors) brought the instant suit. OVG contended at trial (a) the front end loader struck either the riser or the gas line, or (b) the loader lifted the ice encasing the gas line causing it to leak. The City contended (a) its front end loader did not operate closer than 18 inches to the gas line, and (b) the City's participating employees were aware of the gas line's disturbance and notified their supervisor.

The City and survivors entered into a written $150,000 loan receipt agreement. It was filed with the trial court and served upon OVG's counsel thirty days before trial began. OVG filed no motion to sever the City from the trial, but several times during trial offered as evidence an edited version of the agreement from which OVG's counsel had excised all the parts it considered detrimental to its defense of the action. The trial court refused to admit this edited version as evidence.

**I.**

OVG first argues the trial court erred by refusing its tenders of the edited version.

After the loan receipt agreement was served upon it, OVG filed a motion *in limine* proposing to offer as evidence an edited version of the agreement from which it had excised "the dollar figures and inflammatory recitals of the preamble." Its motion was made contingent upon the issuance of an order by the trial court prohibiting the survivors and the City from disclosing to the jury in any manner the material OVG had deleted. The survivors and the City in turn, filed motions *in limine* requesting the court to prohibit any mention whatever of the loan receipt agreement.

Before voir dire of prospective jurors began, the trial court issued an order prohibiting any mention of the loan receipt agreement during voir dire or opening statements, overruled OVG's motion *in limine,* and deferred its ruling on the admissibility of the loan receipt agreement into evidence.

OVG offered its edited version of the agreement conditioned upon the court's issuing of a prohibitory order three times, first when the City called two of its employees to testify, next during OVG's case in chief when it requested permission to question the City's former street commissioner who had testified earlier and was still available, and during its case in chief when OVG proposed to call the City's mayor for such purpose. At a hearing out of the presence of the jury the City's two witnesses denied any knowledge of the loan receipt agreement. The mayor, however, testified he executed the agreement and was familiar with its contents. OVG never established the former street commissioner ever had knowledge of it.

We first note the unexpurgated version of the loan receipt agreement in this case is almost a verbatim recital of the loan receipt agreement in *Otis, infra.* Only the names, factual recitals and amount of the loan have been changed, the operative language being identical.

OVG's edited version deleted the following passages from the document executed by the survivors and the City:

WHEREAS, Sullivan recognizes the facts are such to provide a substantial possibility that the estate will be awarded judgment against each defendant in the aforesaid action; Sullivan further recognizes that any judgment would in all probability be for a large sum of money, and that any judgment entered in favor of the estate would probably be in excess of Three Hundred Thousand ($300,000.00) Dollars; and ...

WHEREAS, the estate believes that its position in the aforesaid action is strong but recognizes that the ultimate disposition of said action, including appeals, is probably at least three (3) years in the future, particularly inasmuch as Ohio Valley Gas Company, Inc., has pursued a policy of delay and noncooperation since the very inception of the aforesaid litigation; and has failed to make any meaningful offer of compromise to settle the estate's claims against it; and

WHEREAS, the estate recognizes that any judgment in its favor would not have to be satisfied until the ultimate disposition of said litigation; and its investigation to date indicates that negligence of Ohio Valley Gas Company, Inc., was a proximate cause of the aforesaid explosion, and that Ohio Valley Gas Company, Inc., is liable in the aforesaid action; and

WHEREAS, the estate is desirous of reaching an agreement which would enable it to receive money at the present time without jeopardizing the estate's claim against Ohio Valley Gas Company, Inc., alleged in the aforesaid action; and the City of Sullivan desires to limit its liability for the death of Katherine R. Blackburn without shirking its responsibility to her family, and without affecting its rights to indemnity from Ohio Valley Gas Company, Inc.; and

WHEREAS, the estate is willing to compromise all claims against both defendants for a total of Three Hundred Thousand ($300,000.00) Dollars and Sullivan offered to pay One Hundred and Fifty Thousand ($150,000.00) Dollars of

said amount, and Ohio Valley Gas Company, Inc., refused to pay its one-half of such a settlement; and

WHEREAS, Ohio Valley Gas Company, Inc., has been furnished a copy of this agreement before its execution, and has again been given the opportunity to compromise its claim for the sum of One Hundred and Fifty Thousand ($150,-000.00) Dollars, and Ohio Valley Gas Company, Inc., has refused to make such compromise; ....

In addition, all references to the dollar amount of the loan in the operative portion of the agreement were deleted.

■ Loan receipt agreements are admissible in evidence for impeachment purposes when one party to the loan agreement calls another party thereto as a witness to testify on its behalf. *Gray, Adm. v. Davis Timber and Veneer Corp.,* (1982) Ind.App., 434 N.E.2d 146, 148; *State v. Thompson,* (1979) Ind.App., 385 N.E.2d 198, 210. OVG, however, never tendered the complete loan receipt agreement to the trial court, it only tendered its edited version thereof.

■ Loan receipt agreements have been looked upon with approval as a legitimate settlement device for many years. *State v. Ingram,* (1981) Ind., 427 N.E.2d 444, 446; *American Transport Co. v. Central Indiana Rwy. Co.,* (1970) 255 Ind. 319, 264 N.E.2d 64, 66; *Gray, Adm., supra,* 434 N.E.2d at 148; *Erskine v. Duke's GMC, Inc.,* (1980) Ind. App., 413 N.E.2d 305, 307; *Dias v. Daisy-Heddon,* (1979) Ind.App., 390 N.E.2d 222, 228; *Burkett v. Crulo Trucking Co., Inc.,* (1976) 171 Ind.App. 166, 355 N.E.2d 253, 258; *NIPSCO v. Otis,* (1969) 145 Ind.App. 159, 250 N.E.2d 378, 390; *Klukas v. Yount,* (1951) 121 Ind.App. 160, 98 N.E.2d 227, 229.

■ We not only approve of, we encourage loan receipt agreements because 1) they provide immediate funds to those who need them, circumventing the delay inherent in a prolonged trial and appeal, and 2) they tend to settle litigation.

■ Such agreements are, however, subject to close scrutiny to "insure that a non-participating co-defendant is not deprived of his right to a fair trial." *Health and Hospital Corp., etc. v. Gaither,* (1979) Ind., 397 N.E.2d 589, 594; *Burkett, supra,* 355 N.E.2d 261. A non-participator's right to a fair trial may be protected in one of two ways. Our Supreme Court in *Gaither* said:

The remedy for such a co-defendant is to introduce the agreement into evidence so that a conflict of interest will come to the jury's attention or to move for a severance.

*Gaither, supra,* 397 N.E.2d at 594. OVG made no motion for severance after the loan receipt agreement was filed of record prior to trial. Thus, its only remaining remedy was to offer the agreement as evidence.

OVG claims the trial court should have admitted its edited version of the agreement citing Judge Robertson's now famous declaration in *Burkett* that it was time to discourage misuse of loan receipt agreements "by firing a shot across the bow at this time" in support of its position. *Burkett, supra,* 355 N.E.2d at 261. OVG's brief on this point, however, goes far beyond the wisdom of *Burkett.* In sum, it is but a naked invitation for us to authorize ungoverned censorship of loan receipt agreements by non-participators. This we cannot and will not do. Granting such license to non-participators would give them the potential to turn this peacemaking tool into a deadly weapon for use against the very parties who make peace by executing them. This result is equally as undesirable as the one at which *Burkett* was aimed.

There are two equal and competing constitutional rights involved when a loan receipt agreement is offered as evidence, namely, the non-participator's right to a fair trial, and the participating parties' equally important right to liberty of contract. We have discussed the non-participator's right to a fair trial in previous cases extensively. We will not unnecessarily lengthen this opinion by discussing it further. Requiring further discussion, however, is the participators' right to liberty of contract, and the correlative right to have the agreement, uncensored, put before the

jury for its use in determining impeachment questions.

■ The privilege of contracting is both a liberty and a property right. It is protected by both the federal and state constitutions. In *Kirtley v. State*, our Supreme Court said:

> However, the personal liberty clause, Art. 1, § 1 of the Constitution of Indiana, . . ., is regarded as an unalienable right and a privilege not to be restricted except perhaps by a proper exercise of the police power of the state. (citations omitted) Liberty as used in the constitution not only means freedom from servitude and restraint, but embraces the right of every one to be free in the use of their powers in the pursuit of happiness . . . subject only to the restraints necessary to secure the common welfare. *The privilege of contracting* is both a liberty and a property right and is *protected by the constitution of both the state and nation.* (Emphasis supplied.)

*Kirtley v. State*, (1949) 227 Ind. 175, 84 N.E.2d 712, 714. The liberty of contract guaranteed by our constitutions is freedom from arbitrary or unreasonable restraint. It is not absolute, however. Liberty of contract is subject to the restraints of due process. *Walgreen Co. v. Gross Income Tax Division,* (1947) 225 Ind. 418, 75 N.E.2d 784, 787. Since the right to a fair trial is involved in due process, reasonable editing of a loan receipt agreement to protect the non-participator's right to a fair trial is authorized, if such editing is necessary in the first instance.

■ Preliminary recitals in a contract have some value in determining the intention of the parties, but they are not contractual, and are never permitted to control the express provisions of the contract. *Stech v. Panel Mart, Inc.,* (1982) Ind.App., 434 N.E.2d 97, 100. Therefore, since they are of a lower order of contractual importance, *objectionable* portions of preliminary recitals may be excised without doing undue violence to the participators' right to liberty of contract.

■ Preliminary recitals or "whereas" clauses, however, serve a legitimate function. Although they do not ordinarily form any part of the real agreement, they do indicate the background of the contract, and may be referred to in determining the intent of the parties where its operative parts are ambiguous. *Stech, supra,* 434 N.E.2d at 100. We also note in this case, one of the participators was a municipal corporation of this state. Here these preliminary recitals also served to inform the City's interested third parties, its residents and taxpayers, of its reasons for making the loan.

■ Participants in a loan receipt agreement, as of right, are free to comment therein upon any aspect of the matter in the preliminary recitals or elsewhere, as they are in any other agreement. If the non-participator proposes to offer it as evidence, any of the participants' statements, including comments on the potential liability of the defendants, the probabilities of plaintiff's recovery, and estimates of the verdict size, may not be excised if such statements under all of the facts and circumstances of the case constitute fair comment on the subjects covered. The participators have a right to have the entire document, including such comments, put before the jury for its use in considering the bias of a witness when the non-participator seeks to impeach his testimony. *State v. Ingram,* (1981) Ind., 427 N.E.2d 444, 446. The non-participator must take fair comment statements as he finds them when they are supported by other evidence in the case. If, however, it is clear some statements were drafted for the sole purpose of "manufacturing evidence", the portions so drafted must be deleted before the agreement is admitted to protect the non-participator's right to a fair trial. *Dias, supra,* 390 N.E.2d at 228–229. In the former case such statements are merely part of the whole document and are admissible. *Ingram, supra,* 427 N.E.2d at 446. If the latter, they violate the non-participator's right to a fair trial. We have further held in any event, the amount of the loan must be deleted prior to admission to protect the plaintiff. *Gray, supra,* 434 N.E.2d at 148–149.

■ This leads to the question who is to edit a loan receipt agreement if any editing is necessary when a non-participating party offers a loan receipt agreement as evidence, the trial court or the non-participating party? Clearly, it is the impartial arbiter, the trial court exercising its sound discretion, who must resolve the question of which parts of the agreement, if any, must be deleted as attempts to "manufacture evidence" and which parts are to be left intact as fair comment. Only in this way can the competing constitutional rights of fair trial and liberty of contract be brought into relative harmony.

OVG never afforded the trial court an opportunity to perform its editing function. On each occasion it tendered only the version of the loan receipt agreement it had edited. It never offered the entire agreement with appropriate motions to delete the parts and portions thereof it deemed injurious. Further, the trial court properly refused OVG's tendered instruction as to the loan receipt agreement because it was not at issue before the jury.

■ The trial court did not err in refusing OVG's tenders of the edited version of the loan receipt agreement and its instruction as to that document.

■ OVG further complains its right to a fair trial was prejudiced because the City during trial did not act as an ordinary defendant would, due to the loan receipt agreement, in the following particulars:

1) the City wanted a verdict in favor of the plaintiff because it wanted to recoup its $150,000 "loan" to the survivors,

2) the City did not care whether the jury returned a verdict against it, so long as it also found against OVG, and,

3) the City wanted to enlarge the damages if a verdict was returned against OVG because a verdict of more than $300,000 would result in repayment to the City of its "loan". It cites to us the following examples of what it considers to be the City's perfidy on this subject:

1. It exercised its "very first peremptory challenge against an obviously intelligent college professor, who questioned his own ability to put a dollar price tag on the value of a human life."

2. It joined plaintiff in arguing damages for loss of consortium were recoverable by a surviving spouse in a wrongful death action.

3. It's "tender hearted counsel . . . offered Plaintiff a glass of water during OVG's cross-examination of Plaintiff."

4. When the survivors' counsel was unable to identify the location where a certain photograph was taken, the City's counsel offered to look it up in his index of photographs.

5. When the City overlooked it on direct examination of its metallurgist, the survivors' attorney on cross-examination brought out the metallurgist had inspected an S-shaped fitting personally and found no evidence of a right angle turn.

6. When OVG's counsel mentioned to City's counsel it appeared the survivors were about to close their case without putting in evidence of the administrator's letters of administration, the letters were offered in evidence a short time later.

OVG characterizes the above actions as evidence of "collusive tactics." It further charges concealment of loan receipt agreements from juries encourages sham and makes a mockery of the fair trial concept.

Sharp, J. in *Otis* cogently discussed the subject of antagonistic co-defendants in the following language:

In various forms throughout the record in this case, Dehner complains of the antagonism which existed between it and NIPSCO. This is attributed to the so-called loan receipt agreement. However, even a cursory examination of the defenses filed by NIPSCO and Dehner would readily indicate that from the earliest stages of this case they were engaged in an extensive effort to blame each other. Such conduct is not foreign to litigation defended by more than one party. There is no legal requirement that co-defendants must be friendly in defending a law-

suit. The realities of litigation clearly indicate that co-defendants are frequently unfriendly.

*Otis, supra,* 250 N.E.2d at 393. The acts of which OVG complains on the part of the City do not demonstrate anything more than the City was antagonistic toward OVG. We find nothing suspicious about furnishing the plaintiff a glass of water during her testimony. Certainly the rules of common courtesy are in effect in a court of law, as well as the rules of law and evidence.

OVG was not denied a fair trial because of the antagonistic attitude of its co-defendant the City.

### II.

■ OVG then argues the trial court erred by (a) not admitting into evidence prior inconsistent statements of certain of the City's employees, (b) admitting certain photographs of other unguarded OVG pipelines, and (c) admitting evidence as to certain federal and state pipeline safety regulations. However, OVG's motion to correct errors does not contain the questions propounded, objections made, rulings of the court, and OVG's offers to prove as to the inconsistent statements, the offers, objections, rulings of the court, and exhibit numbers of the photographs to which it objected, nor the offers, objections, rulings and answers regarding pipeline safety regulations.

Ind.Rules of Procedure, Trial Rule 59(D)(2) provides:

(2) Content of Motion. In all cases in which a motion to correct error is made, such motion *shall separately state the error or errors which are claimed.* The error claimed is not required to be stated under, or in the language of the bases for the motion allowed by this rule, by statute, or by other law. *Each claimed error* shall be stated in *specific rather than general terms,* and shall be accompanied by a *statement of the facts and grounds* upon which the errors are based. (Emphasis supplied.)

OVG's motion to correct errors states the above matters in general rather than specific terms. Thus, they are waived. *Young v. Duckworth,* (1979) Ind., 394 N.E.2d 123, 125–26; *Guardiola v. State,* (1978) 268 Ind. 404, 375 N.E.2d 1105, 1107; *Hinds v. McNair,* (1980) Ind.App., 413 N.E.2d 586, 608; *Johnson v. State,* (1975) 167 Ind.App. 292, 338 N.E.2d 680, 682.

### III.

■ OVG then argues it was error for the trial court to refuse an instruction it tendered which informed the jury various pipeline safety statutes and regulations mentioned during the trial did not apply and were not to be considered by the jury.

Appellate Rule 8.3(A)(7) reads in part:

... The argument shall contain the contentions of the appellant with respect to the issues presented, the *reasons in support* of the contentions along with *citations to the authorities, statutes,* and *parts of the record relied upon,* and a *clear showing of how the issues and contentions* in support thereof *relate to the particular facts* of the case under review. (Emphasis supplied.)

OVG's brief presents no cogent argument nor citation of authority in support of this contention. Thus, the issue is waived. *Matter of Kesler,* (1979) Ind., 397 N.E.2d 574, cert. den'd. 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34; *Poor Sisters of St. Francis Seraph of Perpetual Adoration, Inc. v. Catron,* (1982) Ind.App., 435 N.E.2d 305; *Perry Twp. v. Hedrick,* (1981) Ind.App., 429 N.E.2d 313; *Rumple v. Bloomington Hospital,* (1981) Ind.App., 422 N.E.2d 1309, trans. den'd 429 N.E.2d 214.

### IV.

Finally, OVG claims the trial court erred by ordering its cross-claim against the City stricken on the opening day of trial. OVG filed the cross-claim without leave of court a month before the trial began.

■ A cross-claim may be stated as part of a pleading, *cf.* Trial Rule 13(G), 7(A). Pleadings may be amended as of right before a responsive pleading is served,

or within thirty days after filing, if no responsive pleading is required. "Otherwise a party may amend his pleading only by leave of Court or by written consent of the adverse party . . .", Trial Rule 15(A). OVG's cross-claim was not included in its initial answer or other responsive pleading. Thus, leave of court was a necessary prerequisite to filing the same as an amendment to its responsive pleadings absent its adversary's consent. Since OVG did not obtain leave prior to filing the cross-claim, the trial court properly ordered it stricken upon the opening of trial.

Finding no error, we affirm.

MILLER, J., concurs.

YOUNG, P.J., dissents with separate opinion.

YOUNG, Presiding Judge, dissenting.

I dissent.

The so-called "Loan Receipt Agreement" should have been admitted into evidence for the jury's consideration. To exclude it denied Ohio Valley Gas, Inc. a fair trial. The exclusion of the agreement enabled the City of Sullivan and the plaintiff to become strange bedfellows, intent upon fixing blame upon the gas company not only at trial, but also upon appeal where the City of Sullivan presents its brief *in support* of the judgment against it and the gas company for $700,000.00. Having limited its exposure by the agreement, the City is comfortable in supporting a judgment which, under the agreement, will allow it to recoup its payment to the plaintiff. Any settlement of claims of the parties to litigation which changes adversaries to allies should be made known to the fact finder. This allows the fact finder to better evaluate the credibility of the witnesses.

Compounding this error, the trial judge erroneously refused to admit prior inconsistent statements of city employees, admitted irrelevant photographs of unguarded pipelines other than the one at issue, and permitted the use of federal and state regulations that were clearly inapplicable to the facts. The gas company has preserved these errors and has ably presented its position, which is correct factually and legally, on appeal.

Likewise, it was unfair for the trial judge to strike the cross-claim of the gas company against the City of Sullivan. Cross-claims are permissive pleadings, not required pleadings. Leave of court is not required to file a cross-claim.

For these reasons, I would reverse.